**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| JUANITA G. THOMAS, )<br>  )<br>        Plaintiff, )<br>  )<br>vs. )<br>  )<br>VELOCITY VEHICLE GROUP )<br>CAROLINAS II, LLC and )<br>FREIGHTLINER OF ARIZONA, LLC )<br>dba VELOCITY VEHICLE GROUP, )<br>  )<br>        Defendants. )<br>_____ ) | Civil Action No.:  2:23-cv-06059-BHH-MHC<br><br>**COMPLAINT**<br>**Violation of Title VII:**<br>**Harassment and Termination**<br>**Based on Gender; Retaliation;**<br>**Slander**<br><br>**JURY TRIAL DEMANDED** |

The plaintiff above named, by and through undersigned counsel, complains of the acts of the defendants as follows:

**PARTIES AND JURISDICTION**

1.      That the plaintiff is a citizen and resident of the County of Berkeley, State of South Carolina.

2.      That, upon information and belief, the defendants Velocity Vehicle Group Carolinas II, LLC and Freightliner of Arizona, LLC dba Velocity Vehicle Group ("defendants" or "Velocity") are a foreign corporations doing business and maintaining offices and agents in various counties in the State of South Carolina, including the County of Berkeley, State of South Carolina.

3.      That this court has federal question jurisdiction of the above-styled action pursuant to 42 U.S.C. § 2000e-2, 3 and 5 (The Civil Rights Act of 1964  or "Title VII") and 28 U.S.C. § 1331.

4.     That venue for all causes of action stated herein lies in the District of South Carolina, Charleston Division, in that, pursuant to 28 U.S.C. § 1391(b), the plaintiff resides and defendants do business in this district and division, and a substantial part of the events giving rise to plaintiff's claims occurred here.

## CONDITIONS PRECEDENT

5.     That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below.

6.     That on or about April 10, 2023, and as a result of defendants' discriminatory conduct, all of which is more fully described below, plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based upon gender and retaliation in relation to her termination from the defendants.

7.     That on or about September 28, 2023 plaintiff received a Notice of Right to Sue from the EEOC regarding the Charge of Discrimination described in Paragraph 6 above.

8.     That as such plaintiff has timely filed this action within ninety (90) days of the date on which she received the Notice of Right to Sue described above in Paragraph 7.

## FACTUAL ALLEGATIONS

9.     That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 8 hereinabove as fully as if set forth verbatim.

10.     That plaintiff is female.

11.     That plaintiff worked for defendants and their predecessor, Triple T Trucking, Inc. ("Triple T") (collectively referred to herein as "defendants" or "Velocity") on two

2

(2) separate occasions – initially from on or about 1986 – 1990 and then again later, from on or about 2013 – 2022.

      12.    That during plaintiff's first stint of employment with Velocity, she worked at Triple T's Wilmington, North Carolina store.  Plaintiff was initially hired as an Administrative Assistant, but eventually went on to hold many different positions at that location, including, but not limited to, Inventory Control Manager and Office Manager, thereby gaining a firm understanding of the business.

      13.    That in general, and other than repeated sexual remarks and innuendos by the company President, plaintiff's experience during her first stint of employment was positive, as plaintiff learned a lot, was never disciplined, and left by voluntarily resignation with notice on good terms.

      14.    That while working in North Carolina during her first period of employment with the defendants, plaintiff became acquainted with some of its upper-level management employees, namely the President, Stewart Brown ("Brown").

      15.    That about twenty-three (23) years later, on or about November 11, 2013, defendants Velocity's predecessor, Triple T, rehired plaintiff, this time as the Business Development Manager at its Charleston, South Carolina location.  At the time, the company owned five (5) stores: three (3) in North Carolina (Wilmington, Rocky Point and Warsaw) and two (2) in South Carolina (Charleston and Florence).

      16.    That in or around June of 2014 (after only about seven (7) months of employment at the Charleston office), plaintiff was promoted into the position of Parts Manager at the same (Charleston) location.

17.     That the Parts Manager position involved directly supervising generally between nine (9) and twelve (12) employees, including about five (5) front counter, one (1) back counter, two (2) warehouse employees, and one (1) outside sales person, as well as two (2) drivers and two (2) receptionists.  As the Parts Manager, plaintiff had full authority to hire, supervise, discipline, set schedules and terminate the employees under her.

18.     That as far as plaintiff's reporting structure at the Charleston location, there was a male Service Manager Phil Hrynenko ("Hrynenko") who was on the same level as plaintiff.  Under normal circumstances (and at the other four (4) store locations), both the Parts Manager and the Service Manager reported to a General Manager.  The General Manager would, in turn, report to the President, Brown.  For his part, Brown reported directly to Tim Matt ("Matt"), the owner of the business, who resided and worked out of Wilmington, North Carolina. However, when plaintiff came on board in 2013, the General Manager job at the Charleston store was vacant due to significant turnover issues at the position.  Thus, at the time, Brown, the company's President, performed the General Manager duties in Charleston while still serving as President of the company.  So, initially at least, plaintiff reported directly to the President, Brown.

19.     That because Brown also had to carry out important tasks as the company President, he could not always be present at the Charleston store performing General Manager duties.  On these occasions, plaintiff was assigned to perform General Manager duties at the Charleston location and she performed them well, with no issues, while continuing to perform the duties of her Parts Manager job.

20.     That in or around 2015, Triple T hired Chris Hinders ("Hinders"), a male, as the General Manager of the Charleston location.  However, Brown continued in his role as

General Manager there, splitting or sharing the duties of that job with Hinders, while still performing his position as President of the company.

21.    That in or around 2018 or 2019, Hinders was replaced by Mike McDede, ("McDede") who served as the interim General Manager and then in or around September of 2021 he was replaced by another male, Steve Loggins ("Loggins"), who served as the Branch Manager.  These last two (2) hires performed the Branch Manager job on their own, without sharing it with Brown.

22.    That in addition to the above, during the time the business was owned and operated by Triple T, it employed two (2) Human Resource employees who covered the five (5) stores, including the Charleston location:  first, Dave Stevens ("Stevens"), and later Melissa Phipps ("Phipps").

23.    That in or around January of 2022, defendants bought out Triple T and acquired its five (5) locations, rehiring a good many of Triple T's existing employees.  This purchase brought about changes at the five (5) store locations, including the Charleston store.

24.    That after the Velocity buyout, plaintiff was rehired by Velocity into her same position as Parts Manager at the Charleston store and Hrynenko was likewise rehired into his same position as the Service Manager. And, the employees reporting to both of them essentially remained the same.

25.    That at the same time, the buyout served to alter the reporting structure. While Hrynenko and plaintiff continued to report to the same Branch Manager, Loggins, Loggins, now reported to Clay Rogers ("Rogers"), the Regional Parts and Services Manager.  In reality, though, Hrynenko and plaintiff reported to both Loggins (the Branch Manager) and Rogers, with Rogers being the dominant supervisor.  Rogers reported to Peter Hobbs ("Hobbs"),

the Vice-President of Parts; Hobbs along with Brown (the former President of Triple T whose title at Velocity was now Regional General Manager and who still ran the five (5) stores Velocity purchased from Triple T) both reported to Scott Zeppenfeldt ("Zeppenfeldt"), the CEO of Velocity.   Finally, after the purchase, Gisela Stovall ("Stovall") became the management-level Human Resource employee at Velocity who handled issues at the North Carolina and South Carolina stores.

26.    That plaintiff performed her job duties with Velocity (and with its predecessor) in an above-satisfactory fashion and otherwise maintained an excellent employment record with both companies.  To this point, although neither company provided plaintiff with formal written performance evaluations, plaintiff's sales numbers consistently grew each month, and so did the amount of plaintiff's monthly commission checks; plaintiff consistently generated close to or over $1 million in gross revenue each month; she consistently had low excess inventory rates; plaintiff's warranty numbers were considered to be strong; and her cores were the best out of all five (5) stores.  (Velocity and its predecessors wanted cores to be less than fifty (50%) percent, and plaintiff's cores were consistently between five (5%) to fifteen (15%) percent each month.)

27.    That in addition to the above, plaintiff's supervisors routinely complimented plaintiff on her job performance.  On several occasions over the years, Brown told plaintiff that he slept better at night just knowing plaintiff was running the Parts Department. One of Velocity's Regional Parts Operations Managers, Travis Mobley ("Mobley"), told plaintiff she was doing fine at her job and that, if plaintiff was ever not performing to expectations, he would let plaintiff know.  (He never let plaintiff know); and, the owner, Tim Matt, sent plaintiff an email stating that he was glad plaintiff was rehired by Triple T in 2013.

28.    That over the years, plaintiff only received two (2) performance improvement plans ("PIPs") but, in general, they came about in the last year of plaintiff's employment with the company (meaning plaintiff went over seven (7) years without any discipline); they lacked merit; and were discriminatory.

29.    That despite plaintiff's strong performance and work record during both stints of employment with Triple T and during her employment at Velocity, Brown (in his position as President at Triple T and as Regional General Manager at Velocity), repeatedly engaged in inappropriate conduct towards and around plaintiff – conduct which offended plaintiff and made her feel uncomfortable.  In general, this conduct took the form of sexual remarks, invitations and inuendo, as well as conduct that was demeaning and rude, and it was all because of plaintiff's gender (female).

30.    That due to the length of time at issue and the number of discriminatory incidents, it is not practical to itemize each instance of inappropriate conduct.  However, by way of example, this conduct included, but was not limited to, the following:

    a)  In general, Brown treated plaintiff (and women in general) in an antagonistic, chauvinistic and disrespectful manner as if they were second-class citizens;

    b)  During plaintiff's employment with both entities, Brown repeatedly called plaintiff "baby doll," addressing plaintiff as such in the workplace – sometimes when she and Brown were alone and other times during phone conversations about business matters;

    c)  On repeated occasions during plaintiff's employment with both entities, Brown would come up and hug plaintiff upon plaintiff's arrival to the office, sometimes in front of others and other times while alone in plaintiff's office;

    d)  On one occasion, Brown exclaimed to plaintiff that he wished he'd known plaintiff looked so good because, if he had known, he would have set her up with his brother;

e) On another occasion when plaintiff was working with Brown in Wilmington, plaintiff wore stockings to work – the type that have a line going up each leg. Brown remarked to plaintiff that he wondered where the lines on her stockings led to;

f) Brown stated to plaintiff on more than one occasion that she needed to teach other female employees how to dress – that plaintiff needed to "raise the bar" on their lack of style in the workplace;

g) Also while in Wilmington, plaintiff had to listen to Brown make repeated sexual remarks to a female employee there, Vicky Tamplin. Though Ms. Tamplin appeared to play along with the vulgarities (though plaintiff cannot be sure), plaintiff found the repeated remarks offensive;

h) While employed with both entities, Brown repeatedly commented on plaintiff's looks in the workplace, complimenting plaintiff without solicitation about how good she looked and/or about how nice or sexy articles of clothing plaintiff was wearing looked on her; and he would tell plaintiff she was "gorgeous" and "pretty;"

i) On another occasion, the Human Resource Manager at Triple T, Stevens, told plaintiff that Brown had "a thing" for her, suggesting Brown was sexually interested in plaintiff;

j) On yet another occasion, when Brown and plaintiff were on a business trip, Brown was sitting alone one evening at a table in the hotel lounge or restaurant and, seeing plaintiff, he invited her to join him for a drink. Believing such interaction after hours would be inappropriate, plaintiff rejected his invitation or advance;

k) Oftentimes when plaintiff complained to Brown about sexually-charged incidents in the workplace, he would be dismissive, telling plaintiff that he did not see any issue. For example, one time a salesman, Buddy Howle, told plaintiff it was a good thing she was good looking and wore tight skirts as that's how you make sales because he was not going to teach plaintiff. When plaintiff reported it to Brown, Brown did nothing, only commenting, "He didn't mean anything by it;"

l) With both entities, Brown constantly talked down to plaintiff, raised his voice to plaintiff, and treated plaintiff in a rude, condescending and dismissive manner. At times he also treated plaintiff in an aggressive and threatening manner. In general, he

treated female employees with much less respect and deference in comparison to how he treated male employees;

m) Two (2) or three (3) times during Zoom meetings plaintiff attended with Hrynenko, Brown, a Sales Manager, and Rogers, whenever plaintiff looked down at her phone or attempted to address an emergency in her department by sending a text message, plaintiff would be admonished like a child and told to look up and pay attention. But when the male managers engaged in the same exact conduct, they were not admonished or called out; and

n) While employed at Triple T, and through 2019, Triple T did not have sexual harassment or discrimination policies and, if they ever did, they were not meaningful or were legally insufficient.

31.    That Brown's harassing conduct toward plaintiff as described above occurred frequently, at least one (1) to three (3) or four (4) times a week on average, during the entire course of plaintiff's employment with Triple T and Velocity. It never ended. Plaintiff did not consent to or welcome this conduct; it made plaintiff nervous, anxious and uneasy; it affected plaintiff's concentration and ability to work; and plaintiff was offended by it.

32.    That without ever having been trained on harassment or discrimination by Triple T, and without the benefit of a discrimination policy, or at least a meaningful one, oftentimes plaintiff did not know how to react, deal with, or stop this inappropriate conduct forced upon her by the President of Triple T/Regional General Manager of Velocity.

33.    That throughout 2021, plaintiff observed that Brown's harassment continued but now it involved more unwarranted criticizing and nitpicking of plaintiff's work performance and acting negative towards plaintiff.

34.    That on or about September 21, 2021, Rogers and Human Resource employee Phipps called plaintiff to a meeting. To plaintiff, the meeting appeared to be a positive one. During it, Phipps advised plaintiff that she wanted to place plaintiff on a "business plan" that would lead to plaintiff being promoted into the General Manager position at the store

9

location.  Excited about the opportunity to advance, plaintiff listened to her managers explain plaintiff's path to a promotion.

35.    That as the meeting drew to an end, plaintiff was handed a document and told to "read it as intended," without further explanation.  Since the entire meeting was a positive one, and since the only issue discussed was plaintiff's advancement with the company, plaintiff did not read the document until she got home that evening.  In the meantime, Phipps traveled back to North Carolina that same day (after the meeting), as she felt the meeting with plaintiff was a successful one as well.

36.    That however, when plaintiff did read the document that evening, she quickly realized it was actually a PIP admonishing plaintiff for punctuality and dress code issues - issues that were nonexistent and came out of nowhere.  After reviewing the document, plaintiff was confused and extremely upset, to the point where she was crying.

37.    That two (2) factors made plaintiff feel like she was being picked on in a discriminatory manner:  (i) plaintiff could not understand how a positive meeting pertaining to a promotion morphed into a false PIP; and (ii) the issues raised in the PIP were false - they made no sense.  Plaintiff was at work literally all the time and was never late.  As to the dress code violation, Brown had personally given plaintiff express permission to wear blue jeans to work (as long as they were clean and without holes) because plaintiff was unable to find work khakis (the authorized work clothing) in her small size.  And, whenever plaintiff wore jeans to work, they always looked professional and appropriate.  Plaintiff certainly did not need to be told when she had to report to work or how to dress in the workplace.  Plaintiff was a competent, long-term employee, and the PIP made her sound as if she was a new, probationary employee who could care less about her job.  At the same time, no one had ever brought these issues to plaintiff's

attention at any time before this PIP.  On the contrary, Brown always complimented plaintiff for the way she dressed.

38.    That on or about the following day, Rogers asked plaintiff to meet with him in the conference room.  During the meeting, Rogers asked plaintiff how she felt about the document she was given the previous day at the meeting.  Plaintiff responded that she felt the allegations in the PIP were false and she explained in detail to him why they were incorrect or false.  Rogers did not take issue with plaintiff's comments.  Instead, he apologized, explaining that he really did not know what was in the PIP, as Phipps (at the direction of Brown) had sent him (Rogers) the PIP while he was driving and he did not have a chance to review it before the meeting.

39.    That about three (3) months later Velocity acquired Triple T and its five (5) stores.  At that point Velocity had the legal right and the discretion to rehire Triple T employees or not.  They were a new and different entity, and a new employer.  Plaintiff was even required to fill out and submit a new employment application to Velocity.  In all events, Velocity rehired plaintiff and became plaintiff's new employer and any issues Triple T may have perceived it had with plaintiff in the past had no relevance, as she no longer worked for them.

40.    That in the beginning of 2022 after Velocity took over, plaintiff felt a positive change in the Charleston store.  At first, Velocity used Charleston as a point of contact, placing plaintiff in a position where she was able to spend time with Velocity's management employees without interference from Brown or his employees out of the Wilmington store.  Indeed, during this time, Velocity's management complimented plaintiff on her work performance and how she ran the Charleston store.  In fact, work life for the plaintiff in the beginning of 2022 was productive and enjoyable.

41.     That soon thereafter, though, Brown required Velocity to work through him and the Wilmington office and, sure enough, this circumstance, by and through Brown, worked to taint the way Velocity's management looked at plaintiff.  To this point, on or about June 24, 2022, plaintiff went to Brown's office because plaintiff knew he wanted to see her.  When plaintiff walked into Brown's office, Hrynenko, the Service Manager, was there.  As soon as Hrynenko left, Brown aggressively walked up to plaintiff, getting close enough to invade plaintiff's personal space, he raised his hand and arm up, and then extended his index finger so that it was pointed at plaintiff about a foot from her face and yelled at plaintiff to "shut her damn mouth" and do as he said as we were going to meet with Rogers and Stovall.  Confused and a bit startled, plaintiff asked Brown if she was in trouble. Brown aggressively snapped that, if plaintiff just did what she was told to do, that she would be fine.

42.     That thereafter, Brown took plaintiff to a conference room in the building. Once there, Rogers and Stovall were present.  Despite the presence of the two (2) other employees, and despite Brown's pre-meeting talk with plaintiff leading plaintiff to believe that Velocity was the "bad guy" and that his advice and intervention would save plaintiff from some type of drastic decision they were about to make, it was Brown who did all the talking.  In fact, Brown talked for about forty-five (45) minutes, telling plaintiff she was a great manager, but that she had a terrible attitude and there had been complaints by other employees about it.  Of course, being in her job as long as she had, plaintiff was very aware of her management style, so plaintiff denied this characterization of her attitude.  Rogers, who had never witnessed plaintiff display a "terrible attitude," told plaintiff that she was, in fact, a good manager, but there were a couple things she could improve on and "we will be fine."

43.    That Brown then gave plaintiff a PIP that day for negative and disruptive interaction with fellow employees and for failing to respond to emails sent to her by management-level employees – another false charge.  The PIP also stated that plaintiff had negative interactions with four (4) identified employees (one of which was Stovall) and it identified plaintiff's offending conduct as: speaking with a raised voice, making snarky comments, and even hanging up on an employee (when in actuality, the employee hung up on plaintiff).  The PIP required plaintiff to attend and complete approximately seven (7) to ten (10) leadership classes by July 29, 2022.  Finally, the PIP stated that, if plaintiff did not show "immediate, significant and on-going improvement…she would be subject to further disciplinary action."  The PIP did not mention "termination" as a future option.

44.    That the PIP was extremely upsetting to plaintiff because she felt that, just like the first one, it lacked merit and was discriminatory.  At least four (4) circumstances led plaintiff to this belief.  First, on the day of the PIP (after it was given to plaintiff), Brown entered plaintiff's office where he found plaintiff upset and tearful over the PIP that he had just given her.  Even though plaintiff was clearly upset, Brown pressed on plaintiff, telling her the following:

   a)  That Velocity's Chief Operating Officer, Zeppenfeldt, had instructed him not to write plaintiff up that day but to, instead, provide her with training to make her a better manager;

   b)  That Zeppenfeldt had told him **not to come down to Charleston** and reprimand plaintiff that day, but he did so anyway; and

   c)  That Zeppenfeldt asked to be present on the Zoom call that day, but that Brown told him it was not necessary.

45.     That based upon these remarks, it is evident that Velocity did not really believe plaintiff had engaged in conduct that violated any work rule which would warrant discipline.

46.     That second, Brown was well aware of plaintiff's direct, "no-nonsense" management style – a style he had cultivated and supported over the years.  In the past, Brown had complimented plaintiff several times on her management style, telling plaintiff that he admired the fact that she did not shy away from conflict and that the company needed more managers like plaintiff.  And, in or around 2020, when plaintiff asked Brown for his opinion in regard to her management style, he replied that he liked the way plaintiff managed her employees; that he liked plaintiff's grit, integrity and honesty and that he liked the way plaintiff ran her store (before ending his reply by calling plaintiff "baby doll").  In other words, for years he fostered plaintiff's blunt, no-nonsense and direct management style, only to now use it against plaintiff.

47.     That third, no one, not Brown or any other Velocity employee, bothered to seek plaintiff's side of the story before issuing the PIP.  Had they done so, they would have known the allegations underlying it were false; that plaintiff never hung up on anyone; that plaintiff never yelled at any employee; and that she certainly did communicate with her supervisors, including timely responding to their emails.  As to the email/communication issue, plaintiff was not given any specific examples of her alleged email deficiencies and she was not shown any such emails.  Plaintiff had been preparing, sending and reading emails to and from management at Triple T and then Velocity for over eight (8) years and there was never a problem.

48.     That finally, at least one of the employees named in the PIP as someone who had negative interactions with plaintiff told others he never complained about plaintiff to Human Resources (or to anyone else) and that he did **not** have negative interactions with plaintiff.

49.     That despite the obvious false nature of the PIP, plaintiff complied with its terms, attending the seven (7) to ten (10) leadership classes mandated by the PIP.  In fact, somewhere between July 22-27, 2022 plaintiff, along with Brown and a group of other employees, attended one of the leadership classes in Florence, South Carolina where they stayed in the same hotel together.  One evening after a leadership class, Brown, and around eight (8) to ten (10) other employees and plaintiff, all went out to dinner together.  Many of the employees at the dinner consumed alcohol, including Brown.  During the dinner, at least plaintiff and one other employee observed that Brown was aggressively flirting with their waitress to the point where it was offensive to some of the employees at the table, including the plaintiff.

50.     That after dinner, plaintiff went back to the hotel and was sitting at a table in the hotel's lounge.  At some point Brown saw plaintiff, came over to her table, leaned over, getting closer to plaintiff, and then seductively whispered, "Why don't you come up to my room?"  Based on Brown's aggressive flirting with the waitress that evening, his consumption of alcohol at dinner, his past incidents of inappropriate behavior towards plaintiff, as well as the context and his tone and demeanor in extending the invitation, there was no doubt in plaintiff's mind that Brown was asking her to have sex with him in his hotel room.  Plus, there was absolutely no work-related reason for plaintiff to be in Brown's hotel room that night.  Offended, plaintiff asked "Are we going to have this conversation?"  Embarrassed, Brown just walked away, leaving plaintiff highly offended, upset, anxious and angry.  The man who had been

calling plaintiff "baby doll," repeatedly commenting on her looks for years, and the same man who had plaintiff falsely disciplined on two (2) separate occasions, was now summoning her in a smug manner to his hotel room for sex.

51.    That after returning to work, Brown acted as if nothing had happened. Plaintiff decided to wait awhile to report the incident at the hotel because she did not want Velocity to perceive that her report of harassment was connected to the PIP.

52.    That in the meantime, in or around late July or early August, 2022, Velocity advised plaintiff that she **had fully met all terms and conditions of her PIP; that the PIP had ended**; and that plaintiff's alleged "negative interaction issue" had significantly improved.

53.    That on or about September 10, 11 or 12, 2022, about five (5) weeks after the incident, plaintiff reported Brown's inappropriate gender-related comments and conduct toward her to Travis Mobley ("Mobley"), the Regional Parts Operation Manager who, while not in plaintiff's chain of command, was a high-level management employee, higher in the chain of command than plaintiff, and thereby plaintiff engaged in protected activity under Title VII.

54.    That once plaintiff mentioned the nature of Brown's behavior, Mobley stopped the conversation, told plaintiff to call Human Resources, and, in fact, Mobley called his boss and Human Resources at Velocity and immediately reported the matter himself.

55.    That shortly after the above events, Stovall was in touch with plaintiff, requesting to interview her in regard to her complaint of discrimination.  Plaintiff agreed to the interview, but requested a short period of time to gather her thoughts, and plaintiff further requested that Stovall be recused from the investigation, since she was present when Brown gave

plaintiff the PIP and since she was listed in the PIP as one of the employees plaintiff allegedly interacted with in a negative manner.

56.    That Velocity agreed plaintiff could have a short while to gather her thoughts, but denied plaintiff's request that Stovall recuse herself from the investigation – though Velocity did allow plaintiff to have another Human Resource employee, Amada Alvarez ("Alvarez"), present during the interview.

57.    That on or about that same day (September 12, 2022), plaintiff attended a virtual meeting with Stovall and Alvarez wherein plaintiff was interviewed about her allegations against Brown.  The meeting lasted 30-45 minutes with Stovall doing all the talking and asking all the questions.  Throughout the interview, Stovall had a frown on her face; and, at one point, while plaintiff was answering one of her questions, Stovall even began to move her head from side to side, non-verbally indicating she did not believe plaintiff's allegations.  Along these same lines, Stovall asked plaintiff why she waited so long to report the matter.  Plaintiff responded that she wanted to put some distance between her PIP and her report of harassment to avoid the perception that her complaint was in retaliation for the PIP.

58.    That otherwise plaintiff answered all of Stovall's questions to the best of her abilities, providing Stovall with the details of Brown's advances toward her at the conference in Florence and advising Stovall that Brown had made other sexually-related remarks to her in the past.  To the latter remark, Stovall asked plaintiff if she could prove the past remarks.  When plaintiff explained that to her knowledge there were no witnesses to the remarks, Stovall did not question plaintiff any further about them.  Stovall ended the interview by indicating she would investigate and be in touch with plaintiff.  In the meantime, no one was suspended or sent home

and no one made any efforts to separate Brown from plaintiff or to ensure the alleged harassment stopped.  In reporting the harassment to Stovall, plaintiff again engaged in protected activity.

59.     That around that same week, Velocity initiated a Zoom call reviewing all of their hiring processes, including the title of the employees at Velocity who had authority to hire. During the call, it was made clear that, under Velocity's policies, plaintiff had the absolute right to hire employees under her in the chain of command.

60.     That on or about September 13, 2022, plaintiff interviewed a woman, Elizabeth Maverick ("Maverick"), for a warehouse helper position at Velocity's Charleston location.  Plaintiff felt that Maverick interviewed well and was a good fit for the job.  Plaintiff even let the applicant know that she wanted to hire her.  As such, that same day, September 13, 2022, and consistent with what plaintiff was just told during Velocity's Zoom call, plaintiff emailed Stovall (and copied Brown) advising her that her interview with Maverick went very well and that she would like to offer her $22 an hour.  However, plaintiff received two (2) unexpected responses to her email.

61.     That first, that same day (September 13, 2022), and contrary to the instructions Velocity imparted during its Zoom call, Brown emailed plaintiff and copied Stovall and Rogers, advising plaintiff that he (Brown) wanted David Shinault ("Shinault") to be involved in all interviews and subsequent hirings when it came to plaintiff's employees.

62.     That thereafter, on or about September 13 or 14, 2022, Shinault called Maverick on his own and interviewed her all over again – a gesture that was entirely unnecessary, unprofessional, and confusing to the candidate.  After the call from Shinault, Maverick called plaintiff, stating she was confused and that she had been expecting a call from plaintiff offering her the position, not a second interview.  Maverick further told plaintiff that,

during her second interview, Shinault had made unprofessional and inappropriate remarks to her about plaintiff, including that he did not know what was wrong with plaintiff or what the problem was with plaintiff; that plaintiff was deficient and lacked the skills necessary to interview prospective employees; that plaintiff could ***not*** retain employees; and that plaintiff had a problem retaining employees that she hired – none of which is true. In fact, the above statements are slanderous and retaliatory.

63.    That in the meantime, Shinault prepared an email to Brown, Stovall, Rogers and plaintiff summarizing his interview with Maverick and concluding in strong terms that she was not a good fit for the position. Not surprisingly, Velocity did not hire Maverick, thereby undermining plaintiff's authority as a supervisor.

64.    That at the same time, Stovall called plaintiff irate and yelling at plaintiff for requesting that Velocity pay Maverick $22 an hour – again, undermining plaintiff's supervisory authority.

65.    That on top of all this, an issue came to a head that same week involving Brown and Shinault repeatedly requiring female employees working under plaintiff to cover the phones when employees working the front counter were at lunch, on vacation, taking sick leave, and/or on Saturday mornings, even though male employees were available to do the job. Plaintiff had two (2) employees under her who answered the phones on a daily basis. Still, more help was needed, especially when one of the employees was at lunch or on sick or vacation leave.

66.    That for a significant amount of time the issue was taken care of, as a female employee in the Financing Department covered the phones as needed because the nature and duties of her job provided her with free time to perform the task. However, when she left the

company, Velocity hired a male, Anthony Fortelney ("Fortelney"), into her Finance position. Fortelney covered the phones for about two (2) months, then proclaimed he was no longer willing to do it - without any objection or discipline from Triple T and/or Velocity. After this, management, including Rogers, Brown and Shinault, constantly asked and assigned only female employees to cover the phones without assigning or asking male employees to do so, despite the fact that Fortelney had the time to do it, despite the fact that four (4) of the front counter employees were men, and despite the fact that the Service Manager, Hrynenko, was also a man.

67.    That since at least 2019, the above-named management employees would demand or firmly ask plaintiff or her female employees to perform the job covering the phones. Most recently, they would tell plaintiff or one of the following female employees who worked for plaintiff to do it:  a female driver, Robin Smalls ("Smalls"), a front parts counter employee, Stephanie Hardie ("Hardie"), or an inventory employee, Ryan Argo ("Argo"). Plaintiff and her female employees were extremely busy and, for the most part, did not have the time to cover the phones. Still, these male managers never asked Fortelney, who did have time, or the other four (4) male employees who also worked the front counter, or the male Service Manager to perform the task.

68.    That in or around June, July and August of 2022, Brown was the management employee who typically asked plaintiff or one of her female employees to cover the phones. When he did, plaintiff would oppose this discriminatory practice by openly asking Brown if he was targeting women to perform the task when men were just as available to do it, if not more so than the women.

69.    That in or around September of 2022, Shinault was the management employee who would ask plaintiff or her female employees to perform the task. Again, when

either manager engaged in the practice, plaintiff would oppose it by asking, "Are you targeting women to do the job?" or "Why don't you ask Hrynenko (the Service Manager) to do it?  Is it because I'm a woman?" or plaintiff would respond with words to the effect of "Why are you asking my female employees to cover the phones?  Because they are women?  Because they are women with pretty painted fingernails?" In response, neither manager answered the question and would typically just walk away.  Between June and October of 2022, plaintiff opposed this practice on many occasions in the manner described above, thereby engaging in protected activity under Title VII.

70.    That on this specific week, somewhere around September 14 or 15, 2022, Shinault stated he could not answer the phones and then asked plaintiff and then Hardie if they could perform the task.  In response, Tina Whetzel, who was present, asked Shinault if he was singling out women for the job.  Without denying the accusation, Shinault just walked away without responding to the question.

71.    That on or about September 20, 2022, Stovall prepared and delivered correspondence to plaintiff, stating that the company had completed its investigation into plaintiff's harassment allegations and that Velocity was unable to substantiate them.  According to the correspondence, other than Brown and plaintiff, only one other witness was interviewed during the investigation, but Velocity refused to reveal the name of the said witness.

72.    That all remained relatively quiet for the ensuing three (3) to three and a half (3½) weeks.  In fact, plaintiff was having an incredible month workwise, achieving the highest sales numbers in the store – though no one in management acknowledged it.  Then, on or about October 22, 2022, David Shinault asked plaintiff to meet with him in the conference room.  Once there, Stovall was also present. During the meeting, Stovall fired plaintiff, referencing the

PIP she had received back on June 24, 2022, and further stating that plaintiff had not made any improvements since receiving the PIP. In response, plaintiff rhetorically asked Stovall if she was kidding. Stovall continued that two (2) of plaintiff's employees had made negative remarks about plaintiff's management style in their exit interviews. Plaintiff asked Stovall if it was Shannon Jones ("Jones") and Argo, but Stovall refused to identify the employees. Otherwise, no other reason was given to plaintiff for the unexpected and unwarranted termination.

73. That the two (2) reasons brought up during the termination are false and/or not credible, as Velocity had expressly advised plaintiff that she had successfully completed and satisfied the terms of her PIP and that the alleged "negative interaction" issue had improved. Thereafter, there were no incidents of negative interaction with employees. As to the two (2) employees who quit, Jones stormed off the job and quit after verbally attacking plaintiff, using graphic and obscene profanity, and without providing plaintiff with two (2) weeks' notice or any notice regarding her resignation to the company. As it turns out, the two (2) employees are good friends and had raised similar complaints against a prior manager they had both worked for at another company.

74. That after terminating plaintiff Velocity attempted to replace her with a male employee, offering the job to Brandon Holmes ("Holmes"), Joe Perez ("Perez") and Michael Karkowsi ("Karkowski"). Thereafter, for the most part, Velocity left the position open. Also, on or about the day after plaintiff was fired, Velocity's management employees told third parties, including persons who do business with Velocity and lower-level Velocity employees without a need to know, that plaintiff had some sort of an unwarranted breakdown or fit of anger at work wherein she got mad one day and left work – allegedly abandoning her job. Of course, nothing is further from the truth.

75.    That finally, there is evidence that Velocity (and Triple T) treated similarly-situated male employees more favorably than it treated plaintiff.  To this point, when male employees actually did engage in rude or hostile interactions with their employees, they were not terminated.

76.    That for example, Chris Hinders, the General Manager in Charleston, would yell at plaintiff, use profanity towards her and, on one occasion while he was unduly attacking plaintiff (and plaintiff was seated on the other side of his desk), Hinders threw his cellphone at plaintiff, with it landing on the side of the desk nearest to plaintiff.  When plaintiff reported this assault to Brown (who played a significant role in plaintiff's termination), Brown would only say "hang tight" and/or "it will work itself out" and/or "I'm thinking of transferring him to Wilmington."   However, to plaintiff's knowledge, Hinders was never disciplined, let alone terminated for his conduct.

**FOR FIRST CAUSE OF ACTION:**
**VIOLATION OF TITLE VII**
**42 U.S.C. § 2000e-2 and 5**
**TERMINATION BASED ON GENDER**

77.    That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 76 hereinabove as fully as if set forth verbatim.

78.    That at all pertinent times, as defined by Title VII, defendants employed fifteen (15) or more employees and, as such, defendants are an "employer" as defined by Title VII, and is otherwise subject to that Act.

79.    That plaintiff is female and, therefore, a member of a protected class.

80.    That at all times plaintiff performed her job duties at defendants in a manner that met defendants' reasonable and legitimate expectations.

81.    That despite the above, on or about October 22, 2022 plaintiff suffered adverse action at defendants when defendants fired her, without cause and without prior warning or notice and for false reasons or reasons unworthy of credence.

82.    That after firing plaintiff, defendants attempted to replace plaintiff with three (3) different men (who were, thus, outside of plaintiff's protected class) and then defendants kept the position open.  Moreover, defendants' reasons for firing plaintiff were false and/or unworthy of credence.  Finally, other similarly situated employees outside of plaintiff's protected class who engaged in conduct similar to the conduct plaintiff was charged with were treated more favorably than plaintiff.

83.    That as such, defendants fired plaintiff because of her gender (female), all in violation of the Civil Rights Act of 1964 or Title VII.

84.    That  as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and plaintiff further seeks her reasonable attorney's fees and costs and prejudgment interest.

85.    That the defendants' actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff seeks punitive damages from the defendants.

**FOR A SECOND CAUSE OF ACTION:**
**VIOLATION OF TITLE VII**
**42 U.S.C. § 2000e-3**
**RETALIATION**

86.    That the plaintiff hereby realleges each and every allegation contained in Paragraphs 1 through 85 hereinabove as fully as if set forth verbatim.

87.    That at all pertinent times defendants employed fifteen (15) or more employees and, as such, defendants are an "employer" as defined by Title VII, and otherwise subject to the said Act.

88.    That as alleged above, plaintiff engaged in protected activity by complaining to various upper-level management employees at defendants (who were authorized to receive such complaints) that she felt she was being discriminated against because of her gender. Plaintiff last made such complaints during the week of September 13, 2022.

89.    That defendants fired plaintiff on or about October 22, 2022, just short of five (5) weeks after plaintiff last engaged in protected activity, all without notice, warning or cause and for false reasons and/or reasons that are unworthy of credence.

90.    That based upon the above timing evidence (and being terminated for false reasons or reasons unworthy of credence as well as comparator evidence) a causal connection existed between plaintiff's protected activity and the adverse action against her.  Moreover, plaintiff's complaints were made in good faith and, therefore, constitute protected activity under Title VII.  Thus, defendants really fired plaintiff in retaliation for engaging in protected activity, all of which is a violation of 42 U.S.C. § 2000e-3.

91.    That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and

suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and plaintiff further seeks her attorney's fees and costs and prejudgment interest.

92.     That the defendants' actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff seeks punitive damages from the defendants.

**FOR A THIRD CAUSE OF ACTION:**
**VIOLATION OF TITLE VII**
**42 U.S.C. § 2000e-2 and 5**
**HARASSMENT/HOSTILE WORK ENVIRONMENT**
**BASED ON GENDER**

93.     That the plaintiff hereby realleges each and every allegation contained in Paragraphs 1 through 92 hereinabove as fully as if set forth verbatim.

94.     That at all pertinent times defendants employed fifteen (15) or more employees and, as such are an "employer" as defined by Title VII, and otherwise subject to the said Act.

95.     That plaintiff is female.

96.     That as alleged above, defendants harassed and bothered plaintiff by making inappropriate sexual remarks to her, by propositioning her, by threatening her in a mean and antagonistic manner, by nitpicking her work, by disciplining her, and by treating her less favorably than the male workers, all on a repeated and continuous basis.

97.     That defendants' conduct was offensive to plaintiff and unwelcome, and plaintiff so advised defendants.

98.   That said harassment described above was based on plaintiff's gender and sex.

99.   That defendants' behavior humiliated plaintiff, unreasonably interfered with her work performance, affected the terms, conditions and privileges of her employment at defendants and otherwise caused plaintiff severe psychological and physical harm.  Moreover, the harassment was pervasive and severe and happened on repeated occasions.

100.  That defendants' actions as alleged above, created a work environment that plaintiff found, and a reasonable person would find, hostile and abusive.

101.  That plaintiff complained about the above-described harassment directly to defendants and defendants were otherwise on notice that the harassment was occurring as it occurred openly and on a widespread basis at the defendants and supervisors at defendants engaged in the harassment and/or were told about it.

102. That despite the above, defendants wholly failed to take prompt and effective remedial action to end the harassment, and defendants continued to harass and discriminate against the plaintiff due to her gender and sex, even after plaintiff complained about the harassment and/or after defendants became aware of the harassment or should have been aware of it.

103. That the actions of defendants in subjecting plaintiff to unwanted harassment, all as described above, constitutes discrimination against plaintiff based on gender and sex in violation of Title VII.

104.  That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and

suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and plaintiff further seeks her reasonable attorney's fees and costs and prejudgment interest.

105. That the defendants' actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff seeks punitive damages from the defendants.

### FOR A FOURTH CAUSE OF ACTION: ### SLANDER PER-SE

106. That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 105 hereinabove as fully as if set forth verbatim.

107. That defendants published false and defamatory statements about the plaintiff to prospective employees and employees of the defendants and others in the community without a need to know.

108. That specifically, as alleged in Paragraphs 59-64 above, in or around early to mid-September of 2022 defendants initiated a Zoom call with plaintiff and other supervisors wherein plaintiff was told by management that she had the absolute right to hire employees under her in the chain of command.

109. That on or about September 13, 2022, just a week or so after being advised of her right to hire employees (and consistent with the express authority given to plaintiff) plaintiff interviewed a woman for an entry-level warehouse helper position at defendant's Charleston location. After the job candidate's good performance during the interview, plaintiff advised the prospective employee that she (plaintiff) wanted to hire her. That same day plaintiff sent an email to Stovall and Brown advising them she intended to make an offer to the applicant.

110.   That in response, and contrary to the authority given to plaintiff in the recent meeting, Brown emailed plaintiff (and copied Stovall and Rogers) stating that he (Brown) wanted David Shinault (one of plaintiff's male supervisors) to be involved in all subsequent interviews that plaintiff took and all hiring decisions that plaintiff attempted to make.

111.   That then, on or about September 13 or 14, 2022, Shinault called the prospective employee plaintiff had just interviewed and reinterviewed her all over again.

112.   That as alleged, after the call the prospective employee called plaintiff and advised plaintiff she was confused by Shinault's call and that she had been expecting a call from plaintiff offering her a job instead of a second interview.  According to the prospective employee, Shinault further made inappropriate, unprofessional and false remarks to her, all of which alleged that plaintiff was not a competent employee at defendants.  These comments specifically included:

(a)   He did not know what was wrong with the plaintiff;

(b)   He did not know what the problem was with the plaintiff;

(c)   That plaintiff was deficient or lacking in skills necessary to conduct an interview and in making hiring decisions;

(d)   That plaintiff could not retain employees; and

(e)   That plaintiff had a problem retaining employees she had hired

113.   That thereafter, Shinault and the defendants made the decision not to hire the said prospective employee identified above.

114.   That plaintiff was extremely competent in the performance of her job, including interviewing and/or making hiring decisions.  Moreover, plaintiff took great pride in her job and she was experienced at it.

115.    That all of the above statements made by Shinault (acting in the course and scope of his duties at defendants and on defendants' behalf) were false, were made about the plaintiff, and were damaging to plaintiff' reputation.

116.    That moreover, defendants deciding not to hire the said prospective employee after plaintiff had expressed a desire to do so gave others who knew of plaintiff's desire to extend an offer of employment to the prospective employee the false feeling and impression that plaintiff was incompetent at interviewing and making hiring decisions.

117.    That all of the publications referred to above were about the plaintiff, were false, and were made by the defendants without justification, without privilege and with implied and actual malice.

118.    That the statements about the plaintiff enumerated above constitute slander per-se in that they allege plaintiff is unfit to competently carry on in her given trade and profession and that she was otherwise an inferior employee.

119.    That defendants' publications as set forth above had a defamatory and slanderous meaning, impeached the honesty and integrity of the plaintiff and thereby exposed her to public hatred, contempt and ridicule and caused her to be shunned and avoided and to suffer loss of her reputation, embarrassment, humiliation, emotional distress, pain and suffering and loss of enjoyment of life.

120.    That defendants' actions as alleged above resulted in special, general and presumed damages to the plaintiff.

121.    That as a direct result of defendants' conduct as alleged above, plaintiff has suffered damages in the form of loss to her reputation, lost back and future wages, income and benefits, costs associated with finding other work, psychological harm, emotional distress, anxiety,

depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, loss to professional standing, character and reputation, embarrassment, humiliation, personal and/or physical injury and/or illness and prejudgment interest.

122.   That defendants' conduct as described above was undertaken by defendants intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the protected rights of the plaintiff and, therefore, plaintiff is entitled to recover punitive damages from the defendants.

WHEREFORE, plaintiff prays for the following relief against defendants:

(a) As to plaintiff's First, Second and Third Causes of Action under Title VII, for such amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the costs and disbursements of this action, including her reasonable attorney's fees, prejudgment interest and for such other and further relief as the court deems just and proper;

(b) As to plaintiff's Fourth Cause of Action for slander per-se, for such amount of actual and special damages as the trier of fact may find, (including loss to her reputation, lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries),

punitive damages, the costs and disbursements of this action, prejudgment interest and for such other and further relief as the court deems just and proper.

HITCHCOCK & POTTS

By: *s/A. Christopher Potts*
Federal ID No.:  5517
222 West Coleman Blvd., Ste. 124 #11
Mt. Pleasant, SC 29464
Telephone:  (843) 577-5000
Email:  cpotts@hitchcock-potts.com
**Attorneys for the Plaintiff**

Charleston, South Carolina
November 27, 2023